**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

STEVEN NORTHRUP,

          Plaintiff,

vs.

PENFORD PRODUCTS COMPANY,

          Defendant.

No. C05-0012-LRR

ORDER REGARDING
MOTIONS FOR SUMMARY
JUDGMENT

---

## *TABLE OF CONTENTS*

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.     **STANDARDS FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . . . . . . . **2**

III.    **FACTUAL AND PROCEDURAL BACKGROUND** . . . . . . . . . . . . . . . . . **3**

IV.    **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

        **A.**    *Principles Governing the Interpretation of ERISA Plans* . . . . . . . . **25**

              **1.**    *ERISA Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . **25**

              **2.**    *Rules of De Novo Interpretation* . . . . . . . . . . . . . . . . . . . **26**

        **B.**    *Interpretation of the Plan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

              **1.**    *Disputed Plan Clause* . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

              **2.**    *Entire Plan* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

        **C.**    *Review of Remaining Argument* . . . . . . . . . . . . . . . . . . . . . . . **34**

V.      **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

# I. INTRODUCTION

On January 19, 2005, Plaintiff Steven Northrup ("Northrup") filed a complaint against Defendant Penford Products Company ("Penford") to recover disability benefits under a Penford employee benefits plan, that is, the "Disability Retirement Plan for Hourly Rated Employees" (the "Plan"). The court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 because Northrup's claim for benefits arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

The matter before the court is the Motion for Summary Judgment filed by Penford (docket no. 8) and the Cross-Motion for Summary Judgment filed by Northrup (docket no. 16). The court held a telephonic hearing on these motions on March 16, 2006. At such hearing, Leonard T. Strand represented Penford and Ann E. Brown-Graff and Brad J. Brady represented Northrup. The matter therefore is fully submitted and ready for decision.

# II. STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005); *Woods*, 409 F.3d at 990.

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see, e.g., Anderson*, 477 U.S. at 248; *Janis v. Biesheuvel*, 428 F.3d 795, 799 (8th Cir. 2005). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### III. FACTUAL AND PROCEDURAL BACKGROUND

Beginning in 1985, Penford employed Northrup. From September 3, 1985, Northrup worked as a Mill and Blend Operator.

On December 18, 1994, Penford and the Bakery, Confectionary, Tobacco Workers and Grain Millers International Union Local 100G (the "Union")[1] signed the Plan. The Plan, in relevant part, provides:

> This agreement made and entered into by and between Penford Products Co., hereinafter called the Company, and the American Federation of Grain Millers, International, A.F.L.–C.I.O., hereinafter called the Union, and in consideration of the mutual promises and benefits herein contained, the parties agree to the following:

---

[1] Prior to January 1, 1999, the Union was known as Local No. 100, American Federation of Grain Millers, A.F.L.–C.I.O.

*On and after August 1, 1994*, there shall be in effect for hourly rated employees at the Cedar Rapids plant a Disability Retirement Plan.

Those employees who have, because of sickness or injury become permanently and totally disabled and continuously prevented from engaging in any occupation and who have a minimum of ten completed years of service with the Company as defined in the Pension Plan for Hourly Rated Employees, and are receiving Social Security Disability payments shall receive monthly payments from the Company computed on the same basis as normal retirement benefits under the Pension Plan for Hourly Rated Employees as though they had reached sixty-two (62) years of age. . . .

## EFFECTIVE DATE OF PAYMENTS

Payments under the Disability Retirement Plan are contingent on the employee receiving Social Security Disability payments, and payments by the Company under the Disability Retirement Plan shall be effective on the first day of the month following the date the employee applied to the Company for Disability Retirement, if all other eligibility factors in this agreement have been satisfied.

## TERMINATION OF PAYMENTS

Payments under the Disability Retirement Plan shall cease at the time the former employee reaches the age of sixty-two (62) years, and if otherwise eligible for the Pension Plan for Hourly Rated Employees, he shall thereafter be paid the same pension payments under the Pension Plan for Hourly Rated Employees, as though he had retired at the age of sixty two (62) with the completed years of service he had at the time he was approved for the Disability Retirement Plan.

## WAIVER OF PAYMENTS

An employee who is eligible to receive disability benefits under this Disability Retirement Plan may waive such benefits.

Any such waiver must be in writing and provided to the Company prior to the date benefits would otherwise commence.

## COMPUTATION OF COMPLETED YEARS OF SERVICE

Disability Retirement Plan benefits shall be paid on the basis of credited service as defined in the Pension Plan for Hourly Rated Employees, with the years of credited service used in the calculation being equal to the number of years of credited service that the participant had completed as of the date the participant was approved for benefits under this Disability Retirement Plan. Determination of credited service shall allow absences up to 65 days per year. . . .

. . .

## DURATION

Except for the right to reopen the Disability Retirement Plan or Pension Plan for Hourly Rated Employees, because of changes in the Social Security Law, the Disability Retirement Plan for all other purposes shall remain in effect without reopening until August 1, 1997.

On August 1, 1997, the Union made and entered into a collective bargaining agreement.

[The purpose of the collective bargaining agreement is] to promote and insure harmonious relations, cooperation, and understanding between the Company and the Union, to encourage safety of employees, to maintain and increase productivity and quality of product, economy of operations, elimination of waste, cleanliness of plant, and protection of property.

The articles of the collective bargaining agreement, including Article V, Article X and Article XII, facilitate that purpose. Article V addresses seniority, and Section 1 of that article provides:

It is hereby agreed that the term "employee," as used herein, shall mean all persons covered by this contract who have served the probationary period and have established seniority rights as hereinafter provided. All new employees hired shall work a probationary period of three hundred sixty hours (360) during which time they may be released by the Company for any reason, but shall have all other rights under the contract, except seniority rights. At the end of this probationary period, they shall be classified as regular employees with established seniority, which shall date from the original date of employment.

Section 10 of Article V provides:

An employee shall lose seniority if and when:

(a) The employee quits.

(b) The employee is discharged for just cause.

(c) The employee is laid off for a period in excess of twelve (12) months.

(d) The employee is granted a leave of absence and does not return at the expiration date.

(e) When recalled, if the employee fails to accept within three (3) days after being notified by the Company. The employee must report for work within five (5) days except in case of sickness or other good and sufficient reason approved by plant management.

(f) The employee is absent for any reason in excess of 24 months except for being on worker's compensation or as spelled out in Article VIII–Section 1 and 2.

Article X addresses existing plans and, in relevant part, provides:

All existing privileges heretofore enjoyed by the employee covered by this contract in accordance with the following existing plans of the Company shall be considered as part of this Agreement, and shall continue subject to the rules and regulations covering such privileges existing prior to the signing of this Agreement.

<blockquote>
a. The Pension Plan for Hourly Rated Employees of Penford Products Co., effective August 1, 1997.

b. The Disability Retirement Plan effective August 1, 1997.

c. The Group Life Insurance, Group Health Coverage which includes dental and vision care, and Sickness and Accident Insurance, all available to active employees only, as revised August 1, 1997.

d. The Insurance Plan for Retired Employees.

e. Flower Account. . . .

f. 401k Plan known as the PENWEST Savings Plan.
</blockquote>

Section 1 of Article XII provides:

<blockquote>
It is the understanding of the parties hereto that all prior agreements and interpretations, either oral or written, whether in contract form or in prior minutes, and any obligation of either party created by past precedent are embodied in this contract, and that this contract shall constitute the only agreement between the parties.
</blockquote>

From June of 1999 to August of 1999, Penford excused Northrup's absence from his job, and Northrup received sickness and accident benefits. Northrup explained that his absence from June of 1999 to August of 1999 was due to his mental illness, which included severe depression, anxiety and paranoid tendencies. In August of 1999, Northrup returned to work. Despite returning to work, Northrup continued to have problems performing his job and getting along with others, but he never notified Penford that he was having such problems.

On April 16, 2000, Northrup filled a rail car with the wrong product, that is, two incompatible materials. When confronted, Northrup told his supervisors that he did not make a mistake and that, if a mistake had been made, it occurred as a result of his co-

workers' sabotage attempts. On April 25, 2000, Penford terminated Northrup because Penford believed Northrup falsified records and made misstatements to his supervisors to cover up his mistake. After being terminated, Northrup applied for and received unemployment benefits from April 25, 2000 to October of 2000.[2]

The Union, representing Northrup and other bargaining unit employees at Penford, contested Northrup's discharge by filing a grievance. Penford denied the grievance on the ground that Northrup was terminated for just cause. On May 8, 2001, an arbitration hearing was held regarding the appropriateness of Northrup's termination. During the arbitration hearing, the following colloquy between Penford's counsel and Northrup occurred:

> Q.  Since you have been discharged, have you found any new employment?
>
> A.  No, I haven't. I've tried several different places. . . .
>     . . .
>
> Q.  Did you apply for unemployment?
>
> A.  Yes, I did.
>
> . . .
>
> Q.  Okay. Did you stop looking for work in October?
>
> A.  No. No. It's just that I—you know, I felt it was—you know, why keep track, why keep records, so . . .
>
> Q.  At that point your unemployment benefits ran out?
>
> A.  My unemployment ran out also.

---

[2] Iowa Code § 96.4 and Iowa Admin. Code § 871–24.2 govern the receipt of unemployment benefits.

| Q. | Are you asking the arbitrator to reinstate you? |
|---|---|
| A. | Yes, I am. |
| Q. | Are you willing to return to work at Penford if the arbitrator rules in your favor? |
| A. | Yes, I am. |

. . .

| Q. | If the arbitrator would reinstate you, do you think you're able to return to your former duties? |
|---|---|
| A. | Yes, I do. |

In his arbitration opinion and award, the arbitrator provided a statement of the case and a detailed background of the case, summarized the positions of the parties, laid out the pertinent provisions of the collective bargaining agreement and plant rules, stated the issue and the standard of review, and provided a thorough discussion and analysis. After concluding that the terms of the collective bargaining agreement did not prohibit Penford from discharging Northrup and that Penford established just cause to terminate Northrup's employment, the arbitrator denied Northrup's grievance. Such denial occurred on July 16, 2001. Given the arbitrator's ruling, Northrup's employment ended on April 25, 2000, the date Penford discharged him for just cause.

Following his termination and the arbitration, Northrup sought Social Security Disability benefits. As of October 19, 2001, Patricia Drahos, a Human Resources Manager at Penford, knew that Northrup had applied for Social Security benefits. In a notice of award dated July 1, 2002, the Social Security Administration stated that it determined Northrup had become disabled under its rules on April 17, 2000. The Social Security Administration also stated that Northrup had to be disabled for five full calendar

months in a row before he could become entitled to benefits and that, based on the date he became disabled, Northrup's first month of entitlement to benefits was October of 2000.

On July 14, 2003, Northrup called Sheryl Hansen, an employee of Penford, and told her that he wanted to apply for disability benefits. Sheryl Hansen told Northrup that she would look into the matter and get back to him. After investigating the matter and speaking to her supervisor, Sheryl Hansen called Northrup and informed him that he was not eligible for disability benefits because he had been terminated.

On August 13, 2003, Northrup's attorney, Brad Brady, wrote to Patricia Drahos. In his letter, Brad Brady stated:

> Our firm is representing Steve Northrup regarding a possible claim for disability insurance benefits through his employment at Penford Products Co. As I assume you know, Mr. Northrup's employment at Penford terminated on April 25, 2000. The Social Security Office has determined that Mr. Northrup has been disabled since April 17, 2000. . . .
>
> Please provide us with any information concerning eligibility for disability insurance benefits, appropriate application forms, contact information and any other information concerning eligibility so that we can assist Mr. Northrup in determining his eligibility for such benefits. . . .

In response to the August 13, 2003 letter, Patricia Drahos sent a letter dated September 8, 2003 and the requested information to Brad Brady. In her letter, Patricia Drahos stated:

> This letter will respond to your letter dated August 13, 2003, requesting certain information relating to Steve Northrup and informing us of Mr. Northrup's disability as determined by the Social Security Administration.
>
> Enclosed is the information relating to disability insurance benefits that you requested:

1.     Statement of Claim for Total and Permanent Disability Benefits with MetLife;
2.     Disability Retirement Plan for Hourly Rated Employees;
3.     Summary Plan Description for the Pension Plan for Hourly Rated Employees; and
4.     Contract between Penford Products Co. and American Federation of Grain Millers.

There is no separate claim form for the Disability Retirement Plan for Hourly Rated Employees. The Company determines eligibility for the Disability Retirement Plan based on the information submitted on the MetLife claim form and proof of determination by the Social Security Administration that an employee has "because of sickness or injury become permanently and totally disabled and continuously prevented from engaging in any occupation and . . . [is] receiving Social Security Disability payments."

While we are providing the enclosed information in response to your request on behalf of Steve Northrup, based on the information you have provided we do not believe Mr. Northrup is eligible for any of these benefits. In particular, the MetLife benefit requires a claim to be submitted within one year of when the life insurance benefits for Mr. Northrup ended which would have been on April 25, 2000. The Disability Retirement Benefit Plan is only available to employees who are receiving Social Security Disability payments. Because Mr. Northrup's employment was terminated by the Company, he is not currently an employee and not eligible for benefits under this plan. . . .

After receiving the claim form that is used to obtain MetLife disability benefits, Northrup sought disability benefits from MetLife. In his claim dated September 12, 2003, Northrup stated that April 17, 2000 constituted or qualified as the date "[he was] first

totally disabled by [his] illness so that [he was] wholly unable to work" and that the cause of his disability was a mental or emotional disorder.

On April 20, 2004, Dr. Ali Safdar, M.D., wrote a letter to Brad Brady. In his letter, Dr. Ali Safdar stated:

> As you know, I have been the treating psychiatrist of record for Mr. Northrup since June, 1999. Mr. Northrup has been suffering from severe depression with some anxiety and paranoid features. This condition severely impaired his ability to perform his job and interact with co-workers in an appropriate manner. I believe that Mr. Northrup's condition has been long standing prior to his suspension from work in April of 2000. His condition was exacerbated by the pressures of his employment, his inability to perform his job as expected by his supervisors, not getting along with his coworkers. It is my opinion that Mr. Northrup was disabled prior to April 17, 2000.

On or about May 26, 2004, Northrup received a letter from MetLife. Such letter, in relevant part, stated:

> We have completed our review of your claim and have determined that based on the medical evidence submitted, total and permanent disability is substantiated, therefore your claim has been approved effective May 26, 2004.

On June 28, 2004, Northrup made a claim for benefits under the Plan. More specifically, Brad Brady sent Patricia Drahos a letter. In his letter, Brad Brady, in relevant part, wrote:

> We are writing to renew our request on behalf of Steve Northrup for disability retirement benefits through Penford. You may recall that on August 13, 2003, I forwarded [a] letter notifying you of the determination by the Social Security Administration that Steve Northrup has been permanently disabled since April 17, 2000 . . . . At that time, I requested

that you forward to us any information concerning Mr. Northrup's eligibility for disability insurance benefits through Penford, including appropriate application forms, contact information and other information concerning eligibility.

On September 8, 2003, you forwarded documents to me, as reflected in your letter . . . . You stated that Penford "determines eligibility for the disability retirement plan based on the information submitted on the MetLife claim form and proof of determination by the Social Security Administration that an employee has [']because of sickness or injury become permanently and totally disabled and continuously prevented from engaging in any occupation and is receiving social security disability payments.[']"

You informed me that you did not believe that Mr. Northrup was eligible for any disability benefits, noting that "in particular, the MetLife benefit requires a claim to be submitted within one year of when life insurance benefits for Mr. Northrup ended, which would have been on April 25, 2000." Although we see no requirement in the Disability Retirement Plan that it is necessary for Mr. Northrup to satisfactorily complete the MetLife disability benefits application process in order to receive Penford monthly disability retirement benefits, Mr. Northrup has done so, as reflected in the . . . May 26, 2004 notice of award of benefits from . . . MetLife. MetLife's decision should remove any question about whether Mr. Northrup has satisfied any conditions for payment of Penford's disability retirement benefits . . . .

Under the terms of the Penford Disability Retirement Plan for [H]ourly [R]ated [E]mployees by Penford, and the conditions stated in your September 8, 2003 letter—proof of submission of the MetLife claim form and determination by the Social Security Administration of disability—Mr. Northrup clearly is eligible for disability benefits.

We are enclosing for your review a claim for disability benefits on the MetLife form, signed by Steve Northrup on

September 12, 2003, and submitted to MetLife. The claim reflects an initial disability date of April 17, 2000, based on the Social Security award. We understand that Steve was not terminated until April 25, 2000, and was paid wages until that date. Dr. Safdar, Steve's primary treating psychiatrist since June, 1999, confirms that Steve's disability for employment purposes certainly predated April 17, 2000. See Dr. Safdar's . . . April 20, 2004 letter. If Penford believes that an earlier disability date is relevant in determining Steve's eligibility for disability retirement benefits, please let us know and we will amend the claim.

Steve Northrup is permanently and totally disabled and has been disabled since before his termination, and therefore he is entitled to disability benefits. We request that those benefits be awarded retroactively from the date of his termination on April 25, 2000. As you know, Mr. Northrup pursued arbitration through the union in an effort to secure his employment. Shortly after the arbitration proceedings were concluded, he inquired concerning disability insurance benefits but was notified at that time, consistent with the terms of your September 8, 2003 letter to me, that he was not eligible for those benefits because he was no longer employed. We see nothing in the terms of the disability retirement benefits plan that substantiates that condition for receipt of benefits. In fact, since Penford claims that Penford employees must first apply for and begin receiving social security benefits . . . , it would be impossible for a disabled employee to remain employed before becoming eligible for the benefits.

Mr. Northrup continues to be permanently and totally disabled, as reflected in . . . the Social Security Administration's most recent determination of Mr. Northrup's eligibility for benefits on April 13, 2004, and therefore remains eligible for Penford disability retirement benefits.

On July 15, 2004, David Holmes, the Union President, wrote a letter to Patricia Drahos. In his letter, David Holmes, in relevant part, stated:

Union has always had a clear understanding that eligibility for a disability pension is only available to active employees. We have also always had a clear understanding that the active employee must receive a Social Security Disability award to be eligible for a disability pension. The award is a necessary prerequisite to apply for the pension. As a matter of definition regarding an active employee, the Union's consistent meaning of "active employee" for all contractual purposes is an employee who has not lost seniority. Loss of seniority is referenced in the contract's Article V, Section 10.

I know that your request for the Union's understanding is in regard to Steve Northrup's application for a disability pension. I have been a participating member of our union for 23 years and an executive officer for more than 10 years. During my 23 year membership, I have continually consulted with, and often advised, past and present principal officers in pension matters. I can objectively state that executive officer understanding of the disability plan would have precluded Steve Northrup from applying since he was no longer an active member at the time he received his Social Security award. However, I recognize the Steve Northrup case as a legal matter for which I am not qualified to judge. Quite frankly, with an eye toward the expansion of a benefit, the Union has a great interest in how this issue is resolved.

As a final comment, I cannot speak for the decisions of any past executive board; but the current Board has chosen not to pursue a grievance through arbitration when it learned a former employee had applied for Social Security Disability. The Executive Board did not believe it was a good use of Union resources to attempt to return a terminated employee to work when the terminated employee's application for Social Security Disability is an admission that he is disabled and unable to return to work. If Steve Northrup had informed the Union that he was disabled, or was applying for Social Security Disability, I do not think our Union would have arbitrated his discharge. Also, it is hard to comprehend that

> Steve could have given testimony at the arbitration hearing in an attempt to get his job back if he also would have truthfully had to inform the arbitrator that he was unable to return to work. As a Union officer I am curious to discover if Steve made his application for Social Security Disability before or after the arbitrator's decision.

On July 30, 2004, Penford denied Northrup's claim for benefits by letter. Such letter addressed four issues: (1) Receipt of Claim; (2) Determination of Benefits; (3) Claims Review Procedures; and (4) Right to Appeal. In the receipt of claim section, Penford stated that it considered Northrup's June 28, 2004 letter to be his initial claim for benefits under the Plan. In the determination of benefits section, Penford, in relevant part, stated:

> Mr. Northrup's claim for benefits under the Disability Retirement Plan is denied because Mr. Northrup is not eligible for benefits under the Disability Retirement Plan.
>
> We understand from your letter that Metropolitan Life Insurance Company ("Metlife") has recently approved Mr. Northrup's claim for disability installment benefits under the MetLife Group Insurance Plan. The determination as to whether Mr. Northrup is entitled to benefits under the MetLife policy is an independent decision made by MetLife under the terms of their policy. The fact that MetLife has decided to make payments to Mr. Northrup under their policy does not alter the eligibility requirements for benefits under the Disability Retirement Plan.
>
> As expressly provided by the Disability Retirement Plan, persons eligible for benefits under the plan: (i) are employees, (ii) who because of sickness or injury become permanently and totally disabled and continuously prevented from engaging in any occupation, (iii) who have a minimum of ten completed years of service with the company, and (iv) are receiving

16

Social Security Disability payments. Mr. Northrup's employment was terminated for cause on April 25, 2000, four years before Mr. Northrup's claim for Disability Retirement Plan benefits. Therefore, he was not an employee of Penford when the criteria in (iv) was met, and is not eligible for benefits under the Disability Retirement Plan.

In your letter, you dismiss the eligibility requirement because "it would be impossible for a disabled employee to remain employed before becoming eligible for the benefits." That is not correct. Under the collective bargaining agreement (the "Union Contract") with the Bakery Confectionary Tobacco Workers & Grain Millers Union, Local 100G (the "Union") in effect at the time Mr. Northrup was terminated, a member of the union remains an employee for purposes of the Disability Retirement Plan until: (1) the employee quits; (2) the employee is discharged for just cause; (3) the employee is laid off for a period in excess of 12 months; (4) the employee is granted a leave of absence and does not return at the expiration date; (5) the employee fails to report to work after a recall; or (6) the employee is absent for any reason in excess of 24 months (except for certain limited excused extensions). See Article V, Section 10 of the Union Contract. Accordingly, an employee who is absent from work due to a disability remains an employee for up to 24 months, and if none of the other conditions in Article V, Section 10 occur, must begin receiving Social Security Disability benefits within that 24-month absence from work while such person still has his seniority and employee status in order to be eligible to receive benefits under the Disability Retirement Plan. [The] letter from the current Union President [confirms] his understanding of this eligibility requirement. As Mr. Northrup's employment was terminated for cause by Penford on April 25, 2000, he was not eligible to receive benefits under the Disability Retirement Plan.

As I am sure you are aware, the Union pursued arbitration to reinstate Mr. Northrup to employment with Penford. The

arbitration hearing was held on May 8, 2001. Mr. Northrup's testimony under oath in that proceeding is directly contrary to his current position that he has been permanently disabled as of and prior to April 17, 2000.

. . .

Mr. Northrup was unsuccessful in regaining his employment at Penford through the arbitration proceeding as the arbitrator found he was terminated for good cause. Three years later and in direct conflict with this arbitration testimony, Mr. Northrup now asserts that he was actually disabled prior to April 17, 2000.

Northrup was not an employee when he began receiving Social Security Disability Benefits, and as a result he is not eligible for benefits under the Disability Retirement Plan. Even if he could meet these criteria for benefits under the plan, which he does not, Mr. Northrup is estopped from now claiming that he is or was "permanently and totally disabled and continuously prevented from engaging in any occupation." Mr. Northrup's claim for and receipt of unemployment compensation following his termination in April, 2000 was an admission of his ability to work. . . .

In the claims review procedures section, Penford notified Northrup that it had attached the document pertaining to claims procedures for the Plan,[3] and, in the right to appeal section, Penford advised Northrup that he could pursue an appeal.

On September 24, 2004, Northrup requested a review of the July 30, 2004 decision denying his claim for benefits. In his letter, Northrup claimed the contention that he did not meet the eligibility requirements set forth in the Plan and the contention that he could

---

[3] Concerning the initial submission of a claim, the document provides that the Plan considers a claim for disability payments to be filed when an application for benefits is submitted, in writing, to the Plan Administrator.

not seek disability benefits under the Plan because he previously sought unemployment benefits were factually and legally flawed.  With respect to Penford's first contention, Northrup, in pertinent part, stated:

> Your argument regarding the interpretation of the term "employee" is illogical and inconsistent with the plain language of the Disability Retirement Plan. . . . Nowhere in the provision does it state that the employee must receive Social Security benefits *while employed*.  Such a reading would also require a finding that the employee be "continuously prevented from engaging in any occupation" while still employed by Penford.  It is much more logical to read the provision as requiring only that the employee become disabled while employed and meet the other criteria—inability to work and receipt of Social Security benefits at the time that they are seeking the benefits.

> Under your proposed interpretation of the provision, only employees who are excusably absent due to disability would ever qualify for disability insurance.  An employee who quits due to disability, is fired due to disability, is laid off for more than 12 months and becomes disabled at the end of that period, does not return from a leave of absence due to a disability or fails to report to work after a recall due to a disability, would not qualify for disability benefits.  A person is not eligible to receive Social Security disability benefits until they have been disabled for five months.  Under your interpretation, if an employee becomes disabled while actively working, and after becoming disabled, but before five months has passed, quits due to this disability or is fired as a result of the disability they would be ineligible for disability benefits, even though they were disabled at the time they were actively working.

> Mr. Holmes' interpretation of the term employee is, as he himself concedes, not of legal significance. . . .  The section of the Union Contract to which Mr. Holmes refers does not purport to define an employee, but simply describes the

incidents in which an employee loses seniority. It is inconsistent with the plain language of the section itself which states that an **employee** loses seniority in the event of the happening of any of the listed events, implying that despite the happening of the event they would still be considered an employee for other purposes. . . . Even if Mr. [Holmes'] interpretation of the term "employee" is correct, it does not follow that the provision should be read to require that all of the conditions of eligibility be met while still an "employee," especially where it is nearly impossible for two of the requirements to be met, while still working.

. . .

While the language of the provision on its face states that an employee need only become disabled while employed and meet the other criteria for eligibility by the time that they apply for the disability benefits, Penford's interpretation of the eligibility creates at most an ambiguity. As I am sure you are aware, ambiguities in ERISA insurance plans, like all insurance plans, are construed against the insurer. . . . The [Eighth] Circuit has held that ambiguities in ERISA plans should be interpreted in the manner that an average plan participant would interpret them and if that attempt fails, ambiguities should be construed against the insurer. . . . Under this rule, the eligibility requirements of the Disability Retirement Plan should be read as an average person would read them as requiring that the person become disabled while employed and have met the other eligibility requirements when they apply for the benefits. Penford cannot read in additional eligibility requirements from secondary sources, such as the union contract, that would be contrary to the way in which an average plan participant would read the requirements.

In addition, Northrup addressed whether he became disabled on April 17, 2000 and whether he was estopped from seeking disability benefits under the Plan because he previously sought unemployment benefits.

On December 7, 2004, Penford upheld the denial of Northrup's claim for benefits. Concerning its decision, Penford, in relevant part, stated:

> The Plan provides benefits to employees who are members of the Bakery, Confectionary, Tobacco Workers and Grain Millers Union, Local 100G (the "Union"). In order to be eligible for benefits under the Plan, a claimant must be an employee who is receiving Social Security disability benefits. According to Section 10 of the collective bargaining agreement between Penford and the Union (the "Agreement"), members of the union retain their status as an *employee* with seniority rights for up to 24 months after the last day the member worked at Penford, unless certain specified events occur that terminated such member's status as an *employee* earlier.

> As an example, in the event a member who had ten years of service becomes permanently and totally disabled due to a sickness or injury, the member would cease actively working for Penford but would not cease being an *employee* unless one of the early termination events under Section 10 of the Agreement occurred. That member would then apply for disability benefits from the Social Security Administration. The member must begin receiving the Social Security disability benefits within the 24-month period after the member's last day of work at Penford in order to meet the Plan requirement that the member be an *employee* who is receiving Social Security disability payments. If the member did not begin receiving such payments until after the 24-month period, the member would not be eligible for disability benefits under the Plan.

> The Plan requirement that the member be an *employee* (i.e., a member who has retained their seniority rights under the Agreement) provides a reasonable time-frame in which employees can apply for and begin receiving Social Security payments (24 months) and prevents the Plan assets from being subject to claims by former employees of Penford (members who have not worked at Penford for over 24 months) many

years later. The use of the word *employee* provides a limitation period in which members must meet the other eligibility requirements of the Plan.

. . .

In this claim, Mr. Northrup's seniority rights and status as an *employee* terminated on April 25, 2000, when his employment was terminated for cause. Mr. Northrup's termination was subject to an arbitration, and the arbitrator ruled that Mr. Northrup was properly terminated by Penford for cause. Mr. Northrup did not begin receiving Social Security disability benefits until October of 2000, after his status as an employee terminated. Section 10 of the Agreement provides that a member loses his/her seniority rights in the event their employment is terminated for just cause. Accordingly, unlike in most circumstances where a disabled member's status as an employee would not have terminated for 24 months after [his or her] last day worked, Mr. Northrup's status as an employee terminated concurrently with his termination of employment.

This interpretation is supported by the administration of the Plan. The Plan Administrator has consistently interpreted *employee* as an individual who retains seniority under Article V, Section 10 of the Agreement. No member has received benefits under the Plan unless such member was within the 24-month status as an *employee* when such member's Social Security payments began.

Penford also noted that Northrup exhausted all of the Plan's administrative remedies.

On January 19, 2005, Northrup filed the instant lawsuit seeking judicial review of Penford's decision to deny him disability benefits under the Plan pursuant to 29 U.S.C. § 1132(a)(1)(B).

On July 18, 2005, Penford filed its Motion for Summary Judgment. In such motion, Penford made two assertions:

(1)   Northrup's claim for benefits fails because he never received, and was never entitled to receive, social security disability benefits while he was an employee of Penford; and

(2)  Northrup's claim for benefits fails because of his repeated, prior admissions that he was not permanently and totally disabled and continuously prevented from engaging in any occupation while he was an employee of Penford.

On August 31, 2005, Penford answered Northrup's interrogatories.   Those interrogatories, in relevant part, indicate the following:

(1)  Employees are permitted to be absent from work for up to 24 months and their status as an employee continues in the event of an illness or injury, whether work-related or not work-related, if it is substantiated by a medical doctor's or chiropractor's statement.

(2)  Seven persons have applied for disability benefits.[4]   Five of those seven received disability benefits.   The five who received disability benefits were permitted to be absent from work due to injury or illness.   Further, each of those five persons was determined to be eligible for social security disability prior to the date he applied for disability benefits and the date his request for disability benefits was approved. One of the remaining two persons elected not to receive disability benefits or waived his rights to a disability benefit in order to receive benefits under the regular pension.   The only remaining person, that is, Northrup, did not receive disability benefits.

---

[4] The court notes the interrogatories indicate ten people applied for disability benefits, but three of those ten people do not appear to be covered by the Plan because they received disability benefits prior to the effective date of the Plan, that is, August 1, 1994. The court also notes that, from August 1, 1994 to August 1, 2001, only two persons received disability benefits.

(3)  One of the five persons collected worker's compensation benefits, received holiday pay, and accrued vacation pay and pension benefits prior to his receipt of disability benefits.  The four other persons collected sickness and accident benefits, received holiday pay, and accrued vacation pay during the first year and pension credit for up to two years of their excused absences before they received disability benefits.

On September 19, 2005, Northrup deposed Patricia Drahos and Sheryl Hansen. Among other things, both testified as to their understanding of: the Plan, the informal process of applying for disability benefits under the Plan and tracking employees who are seeking such benefits,[5] the collective bargaining agreement, the relationship between the Plan and the collective bargaining agreement, the term "employee," the reasons why Northrup did not qualify for benefits under the Plan, the reasons for excusing absences, including sickness and accident, and the reasons others received disability benefits under the Plan.

On October 7, 2005, Northrup filed a Resistance to Penford's Motion for Summary Judgment and Cross-Motion for Summary Judgment.  In such resistance and cross-motion, Northrup argues that he qualifies for benefits under the Plan and he is not judicially estopped from seeking disability benefits.  With regard to the former argument, Northrup asserts:

(1)  Penford is not granted discretion to interpret the terms of the Plan and, therefore, Penford's denial should be reviewed de novo;

---

[5] The court notes the informal process typically involves the disabled employee, a Union steward, the employee's supervisor and a human resources official.  It also normally involves insurers and officials providing medical documentation.

> (2) The terms of the Plan are unambiguous and he qualifies for benefits under the plain meaning of the terms of the Plan; and
>
> (3) If the terms of the Plan are ambiguous, extrinsic evidence shows that he qualifies for benefits under the Plan.

On November 9, 2005, Penford filed a Reply. On the same date, Penford filed a Resistance to Northrup's Cross-Motion for Summary Judgment. In such resistance, Penford argued:

> (1) The plain language of the Plan document is fatal to Northrup's claim;
>
> (2) Northrup's prior sworn testimony precludes entry of summary judgment in his favor and, indeed, provides another basis for entry of summary judgment against him; and
>
> (3) If the court finds the Plan to be ambiguous, Northrup is not entitled to summary judgment.

On November 16, 2005, Northrup filed a Reply. In such reply, Northrup contends he is entitled to disability benefits under the plain language of the Plan, he is not precluded from seeking disability benefits because of his earlier testimony and the court is able to enter summary judgment in his favor because he obviously meets the only definition of disability used by the administrator of the Plan.

## IV.  LEGAL ANALYSIS

### A.  Principles Governing the Interpretation of ERISA Plans

#### 1.  ERISA Standard of Review

"'ERISA provides a plan beneficiary with the right to judicial review of a benefits determination.'" *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 642 (8th Cir. 2002) (quoting *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998)); *see also* 29 U.S.C. § 1132(a)(1)(B) ("[A plan participant may bring a civil action] to recover benefits due to

him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."). When reviewing a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B), the de novo standard applies unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998 (8th Cir. 2005) (en banc) (discussing when the de novo standard applies); *Ortlieb v. United Healthcare Choice Plans*, 387 F.3d 778, 781 (8th Cir. 2004) (same). Under the de novo standard, "[disputed language is construed] without deferring to either party's interpretation." *Firestone Tire*, 489 U.S. at 112; *see also Melvin v. Yale Indus. Prods., Inc.*, 197 F.3d 944, 948 (8th Cir. 1999) (indicating neither party's interpretation should be favored). If a benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms, a deferential standard of review applies, that is, the court considers whether the administrator abused its discretion. *Firestone Tire*, 489 U.S. at 115; *see also King*, 414 F.3d at 998-99 (discussing when decisions are reviewed only for abuse of discretion); *Ortlieb*, 387 F.3d at 781-82 (same).

In this case, the parties agree the Plan does not give Penford discretionary authority to interpret the terms of the Plan or to determine benefit eligibility under the Plan. Accordingly, the court utilizes the de novo standard when reviewing Penford's interpretation of the terms at issue and its resultant decision to deny benefits.

### 2. Rules of De Novo Interpretation

When analyzing an ERISA plan de novo, ordinary principles of contract construction or interpretation should be used to determine if there is a legal obligation to provide benefits. *Delk v. Durham Life Ins. Co.*, 959 F.2d 104, 105 (8th Cir. 1992) (citing

*DeGeare v. Alpha Portland Indus.*, 837 F.2d 812, 815 (8th Cir. 1988)).[6]  Moreover, the court must examine the language of the plan documents.  *Bond v. Cerner Corp.*, 309 F.3d 1064, 1067 (8th Cir. 2002) (citing *DeGeare*, 837 F.2d at 816).  The plan language must be given its "'common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words.'"  *Melvin*, 197 F.3d at 947 (brackets in original) (quoting *Barker v. Ceridian Corp.*, 122 F.3d 628, 632 (8th Cir. 1997), in turn quoting *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996)); *cf. Delk*, 959 F.2d at 105 (stating an ERISA plan must be interpreted from the perspective of an average plan participant, and its terms should be accorded their ordinary, not specialized, meaning) (citing *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150, 154 (8th Cir. 1990)).  In addition, "'[e]ach provision should be read consistently with the others and as part of an *integrated whole*.'"  *Bond*, 309 F.3d at 1067 (noting emphasis added and quoting *DeGeare*, 837 F.2d at 816); *see also Wilson v. Prudential Ins. Co.*, 97 F.3d 1010, 1013 (8th Cir. 1996) (acknowledging courts "must construe each provision consistently with the others and as part of an integrated whole so as to render none of them nugatory and to avoid illusory promises"); *Harper v. R.H. Macy & Co.*, 920 F.2d 544, 545 (8th Cir. 1990) (same).

If the text of the plan is clear and subject to only one interpretation, the inquiry is ended.  *See, e.g., Mead v. Intermec Tech. Corp*, 271 F.3d 715, 717 (8th Cir. 2001) (ending analysis because, under the plain and ordinary meaning of the plan's language, the

---

[6] In light of *Firestone Tire*, the Eighth Circuit Court of Appeals vacated and remanded for reconsideration the decision in *DeGeare*.  Just as the Eighth Circuit Court of Appeals has done in the past, the court deems it appropriate to rely on the principles articulated in *DeGeare* that are not implicated by the vacation and remand of the lower court's decision.

participant was not eligible for short-term disability benefits); *see also Bill Gray Enters., Inc. Employee Health and Welfare Plan v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001) (stating there is no need to consider other evidence when the plain language is clear). If, however, the plan is deemed ambiguous, extrinsic evidence may be considered. *Bond*, 309 F.3d at 1067 (citing *DeGeare*, 837 F.2d at 816); *see also Stearns v. NCR Corp.*, 297 F.3d 706, 712 (8th Cir. 2002) (stating facial ambiguity permits the court to consider extrinsic evidence); *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 657 (8th Cir. 1992) (noting use of extrinsic evidence to resolve ambiguity "is applicable even to contracts governed by ERISA").

"A contract is ambiguous when it is reasonably susceptible to more than one interpretation." *Wilson*, 97 F.3d at 1013 (citing *Ehrhardt v. Penn Mut. Life Ins. Co.*, 902 F.2d 664, 667 (8th Cir. 1990)). "The question of what 'other evidence' is admissible turns on the relative ambiguity of the plan provision being construed[.]" *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 950 (8th Cir. 1994); *see also id.* (stating the court should only look to extrinsic evidence to determine the meaning and effect of a particular clause if neither giving the words in the disputed plan clause their ordinary meaning nor examining the entire plan to determine the creator's intent and purposes provides clarification). The extrinsic evidence must go to the intent of the parties to the plan. *Id.* at 950-51. Finally, ambiguities should be construed against the drafter only as a last step. *Bond*, 309 F.3d at 1067 (citing *DeGeare*, 837 F.2d at 816); *see also Delk*, 959 F.2d at 106 ("As a matter of federal common law, a court construing plans governed by ERISA should construe ambiguities against the drafter only if, after applying ordinary principles of construction, giving language its ordinary meaning and admitting extrinsic evidence, ambiguities remain.") (citing *DeGeare*, 837 F.2d at 816).

## B. Interpretation of the Plan

### 1. Disputed Plan Clause

The Plan states:

> Those employees who have, because of sickness or injury become permanently and totally disabled and continuously prevented from engaging in any occupation and who have a minimum of ten completed years of service with the Company as defined in the Pension Plan for Hourly Rated Employees, and are receiving Social Security Disability payments shall receive monthly payments from the Company computed on the same basis as normal retirement benefits under the Pension Plan for Hourly Rated Employees as though they had reached sixty-two (62) years of age.

The fighting issue is whether this clause requires Northrup to receive Social Security Disability payments while still an employee of Penford. Northrup argues that no such requirement exists. The court disagrees.

Under the terms of the Plan, there are three requirements that must be met to receive monthly disability payments from Penford: (1) the employee must have become permanently and totally disabled and continuously prevented from engaging in any occupation because of sickness or injury; (2) the employee must have a minimum of ten completed years of service with Penford, as defined in the Pension Plan for Hourly Rated Employees; and (3) the employee must be receiving Social Security Disability payments. A plan participant could legitimately expect to receive benefits if he or she met each requirement.

Contrary to Northrup's argument, "a reasonable person in the position of the plan participant" would not understand the language of the Plan to assure payment of benefits if the first requirement—disability—occurred while an employee and the other requirements—ten years of service and receipt of Social Security Disability

payments—were met by the time he or she applied for the disability benefits. The plain and clear language of the Plan does not promise that Penford will pay benefits to those who are no longer employees. Rather, it promises to pay benefits to those employees who are receiving Social Security Disability payments. The ability to claim benefits is set by the Plan's terms, and, here, Northrup simply is not entitled to benefits because he was not an employee at the time he began receiving Social Security Disability payments. *Cf. Koons v. Aventis Pharms., Inc.*, 367 F.3d 768, 777 (8th Cir. 2004) (concluding employee is not eligible to receive benefits because the terms of the plan did not permit benefits to be paid to employees who were terminated for violating company policy); *Mead*, 271 F.3d at 717 ("The short-term disability plan in place . . . provided that an employee was eligible for benefits after the employee had been 'off his/her job for more than five consecutive working days' due to a medical condition. . . . Because he did not miss 'five days of work' immediately preceding his resignation, he is not eligible for coverage."); *Melvin*, 197 F.3d at 948-49 (determining the plaintiff's injuries were not "non-occupational" as required for coverage under the plan because his actions at the time he incurred his injuries were directly related to his occupation and employment as a crop duster, even though he was dusting his son's field for free); *Wilson*, 97 F.3d at 1013-14 (concluding health benefits were not available to the plaintiff because plan unambiguously excluded agricultural workers from receiving medical coverage for workplace injuries). Because Northrup's status as an employee ended on April 25, 2000 and he only began receiving Social Security Disability payments in October of 2000, the Plan does not provide coverage.

Furthermore, Northrup believes an interpretation that requires a plan participant to be an "employee" at the time he or she receives Social Security Disability payments is illogical. He argues it is impossible to remain an "employee," as commonly and ordinarily

understood,[7] if one is "permanently and totally disabled and continuously prevented from engaging in any occupation," as required by the Plan, or if one is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be . . . expected to last for a continuous period of not less than 12 months," as required by 42 U.S.C. § 416(i). Given such impossibility, Northrup contends "a reasonable person in the position of the plan participant" would understand the words of the Plan to mean that employee status is only required until a disability occurs. According to Northrup, a reasonable plan participant could legitimately expect to be eligible for disability benefits under the Plan even if, after becoming disabled, his or her employee status ended as a result of quitting or being terminated for just cause. Therefore, Northrup asks the court to construe the Plan in such a manner as to find him qualified for disability benefits depending upon whether he was an employee who became disabled, as opposed to an employee who became disabled, has ten years of service and is receiving Social Security Disability payments.

The term "employee" is not ambiguous in the context of this particular case. The use of the term "employee" in each of the three requirements indicates who is and who is not eligible to receive benefits under the Plan. Clearly, as used in the Plan, the term "employee" is reasonably interpreted by a plan participant to include one who is currently employed by Penford and, because of a disability, seeks benefits. Furthermore, a plan participant would reasonably understand from the language of the Plan that his or her status as an employee does not cease merely because he or she suffers from a disability. This is especially true in light of the ten-year service requirement. Indeed, where an

---

[7] Webster's Seventh New Collegiate Dictionary defines "employee" as "one employed by another usually for wages or salary . . . ."

employee has less than ten years of service, he or she could reasonably anticipate from the words utilized in the Plan that his or her disability status would not prevent years-of-service credit from being accumulated. By utilizing the common and ordinary use of the term "employee" only for purposes of the first requirement, the beneficial effect that the term "employee" has on the second requirement is undermined. Moreover, with respect to the third requirement, it expressly requires the employee to be presently receiving Social Security Disability payments; it does not merely require employment status as of the date the Social Security Administration retroactively determines that a disability exists. Northrup's proposed construction for the disputed clause ignores the clear requirement that each provision must be read consistently with the others. *Cf. Bond*, 309 F.3d at 1068 (concluding construction must allow the partial disability and total disability clauses to be read together as part of an integrated whole). Accordingly, Northrup's proposed construction fails.

### 2. Entire Plan

Analysis of the term "employee" in the context of the Plan as a whole does not alter the court's determination that Northrup failed to satisfy the threshold requirement that he be an employee who is receiving Social Security Disability payments. Rather, the court's conclusion is bolstered.

Northrup's construction of the disputed clause fails to acknowledge the requirement in the Effective Date of Payments provision that "payments under the [Plan] are contingent on the employee receiving Social Security Disability payments." Contrary to Northrup's construction, neither the language in the disputed provision nor the language in the Effective Date of Payments provision requires mere receipt of Social Security Disability payments at some time. The court is not able to set aside the use of the term "employee" in the Effective Date of Payments provision because the Plan's use of such term implicitly

limits those who are eligible to receive disability benefits; the use of the word "employee" cannot be rendered meaningless. Giving effect to the Plan's explicit and unambiguous terms allows the disputed clause and the Effective Date of Payments provision to be read together as part of an integrated whole. *See Bond*, 309 F.3d at 1068 (concluding construction advanced by the plaintiff fails because it ignores the requirement that all parts of the contract be given effect).

Additionally, the same parties, that is, Penford and the Union, entered into the Plan and the collective bargaining agreement. The Plan is not an isolated document and clearly is made a part of the collective bargaining agreement by express language. In fact, without the collective bargaining agreement, the Plan would not exist. When the parties drafted the Plan, they agreed that it would remain in effect until August 1, 1997. Only on August 1, 1997, did the parties renew their commitment to the Plan by agreeing to the terms included in the collective bargaining agreement. The collective bargaining agreement defines the term "employee" in Article V. Based on such definition, the court is confident that Northrup ceased being an employee on April 25, 2000, the date Penford terminated him for just cause and that employees, as defined by the entire Plan, do not cease being employees merely because they become disabled. The court is also confident that ambiguities do not exist when the term "employee" is defined by Article V of the collective bargaining agreement. Thus, the terms are unambiguous in excluding employees who are not receiving Social Security Disability payments from being awarded disability benefits under the Plan. *Cf. Wilson*, 97 F.3d at 1013-14 (reviewing benefit exclusion,

separately explaining three sentences of benefit exclusion and concluding the plaintiff's interpretation could not accommodate the benefit exclusion's third sentence).[8]

## C. Review of Remaining Argument

Having determined that the terms of the Plan are unambiguous and Northrup does not qualify for benefits under the plain meaning of the terms of the Plan, the court declines to consider Penford's alternative argument that Northrup cannot pursue the instant disability benefits claim because his prior admissions indicate that he was not permanently and totally disabled and continuously prevented from engaging in any occupation while he was an employee of Penford. Nonetheless, it appears that, at a minimum, this argument and the facts of this case, which include Northrup's implicit and explicit admissions, preclude judgment as a matter of law in favor of Northrup.[9]

## V. CONCLUSION

In light of the foregoing, **IT IS ORDERED**:

1.      Penford's Motion for Summary Judgment (docket no. 8) is granted.

2.      Northrup's Cross-Motion for Summary Judgment (docket no. 16) is denied.

---

[8] Although it concludes the term "employee" within the meaning of the Plan is not ambiguous when the common and ordinary meaning of the term is considered and each provision of the Plan is able to be construed consistently with the others and as part of an integrated whole, the court notes that, if any ambiguity existed, it would be dispelled by considering the extrinsic evidence that is part of the record. The parties to the Plan clearly intended the term "employee" to be defined by Article V. The court, however, need not examine the extrinsic evidence because its inquiry is ended.

[9] The court notes Northrup's insistence that the Social Security Administration's determination is the only thing that matters, ignores or nullifies the clear and plain language included in the first requirement, that is, there would be no need to include the language "become permanently and totally disabled and continuously prevented from engaging in any occupation because of sickness or injury" in the Plan if all that is required is a disability determination by the Social Security Administration.

3.     Northrup's Complaint (docket no. 2) is dismissed with prejudice and all costs
       of this action are assessed against Northrup.

4.     The Clerk of Court is directed to enter judgment accordingly.

**SO ORDERED.**


**DATED** this 23rd day of March, 2006.

_____
LINDA R. READE
JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA